IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )        1:11CR309-5
                               )
RAFAEL HERNANDEZ-RODRIGUEZ,     )
                               )
            Defendant.         )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

      Defendant  Rafael  Hernandez-Rodriguez  ("Hernandez-
Rodriguez")  is  charged  in  a  superseding  indictment  with
conspiring  to  distribute  5  kilograms  or  more  of  cocaine
hydrochloride  in  violation  of  21  U.S.C.  § 846  and  possessing
with  the  intent  to  distribute  4,931.3  grams  of  cocaine
hydrochloride in violation of 21 U.S.C. § 841(a)(1).  (Doc. 48.)
Before  the  court  is  his  motion  to  suppress  evidence  obtained
during a traffic stop conducted by a highway patrolman following
a  controlled  delivery  to  Hernandez-Rodriguez  by  Drug  Enforcement
Agency  ("DEA")  agents.  (Doc. 47.)  An  evidentiary  hearing  was
held  on  February  8,  2012,  and  the  parties  have  fully  briefed  the
motion.  For  the  reasons  explained  below,  the  motion  will  be
denied.

I.    **FACTUAL BACKGROUND**

As part of an investigation into suspected illegal drug activity, DEA agents arranged for a controlled delivery of cocaine hydrochloride from an undercover ("UC") agent to members of the alleged conspiracy at a Citgo gas station in Greensboro, North Carolina on June 29, 2010.  After the UC made arrangements with the alleged conspirators to deliver the cocaine, DEA agents stationed at the Citgo observed Hernandez-Rodriguez arrive at the gas station in a red pickup truck.

For purposes of this motion, the parties have stipulated to, and the court finds credible, the following facts as outlined in the Government's brief:

> At approximately 12:26 p.m., the UC vehicle began to move to the northeast corner of the parking lot where the vehicle parked next to the red pickup occupied by Defendant Hernandez-Rodriguez.  Agents then observed Defendant Hernandez-Rodriguez exit the red pickup and lift the rear bed cover.  Defendant Hernandez-Rodriguez then approached the UC vehicle and retrieved the two black suitcases containing six packages of cocaine and thirty-four (34) simulated kilograms of cocaine before placing them in the bed of the red pickup.
>
> At approximately 12:30 p.m., agents observed the red Ford F-150 pickup depart the Citgo gas station driven by Defendant Hernandez-Rodriguez.  Moments later, agents observed the red pickup westbound on Grandover Parkway before turning south on Jarvis Road.  Agents then observed the vehicle turn westbound on Grandover Parkway before turning southbound on Vickery Chapel Road.  Agents maintained surveillance of the vehicle until a traffic stop was conducted by North Carolina State Highway Patrol ("NCSHP") Trooper P. Stevens ["Trooper Stevens"] near the intersection of

Vickery Chapel Road and Kivett Drive. Trooper Stevens had received information that the driver of the red Ford F-150 had taken a delivery of the cocaine. The stop was recorded on Trooper Stevens's in-car video camera.

Trooper Stevens was traveling south on Vickery Chapel Road and saw a red Ford F-150 pickup traveling south just ahead of him. The posted speed limit on Vickery Chapel Road is 45 mph. Trooper Stevens estimated the truck to be going 55 mph. Trooper Stevens clocked the truck at 54 mph on his radar. Trooper Stevens activated his emergency lights and stopped the truck.

Trooper Stevens approached the truck from the passenger side and saw a Hispanic male driver with no other passengers. Rather than opening the passenger window, Defendant Hernandez-Rodriguez motioned for Trooper Stevens to open the passenger door. When he opened the door, Trooper Stevens saw a cross on the rearview mirror, a Nextel cell phone on the seat next to Defendant Hernandez-Rodriguez, and lots of papers throughout the vehicle. Trooper Stevens told Defendant Hernandez-Rodriguez that he was stopping him for speeding, and asked for his license and registration. Defendant Hernandez-Rodriguez handed the Trooper his license, but made no attempt to get his registration. Trooper Stevens asked Defendant Hernandez-Rodriguez for his registration a second time, and this time Defendant Hernandez-Rodriguez retrieved his registration and gave it to Trooper Stevens. Trooper Stevens asked Defendant Hernandez-Rodriguez to exit his truck. While they were by the shoulder of the road, Trooper Stevens asked Defendant Hernandez-Rodriguez if he could frisk him for weapons. Defendant Hernandez-Rodriguez consented to a pat-down search, and no weapons were found. The pat down occurred approximately two minutes and ten seconds into Trooper Steven[s]'s stop of Defendant Hernandez-Rodriguez. Approximately twenty seconds later, Trooper Stevens told Defendant Hernandez-Rodriguez that he was going to give Defendant Hernandez-Rodriguez a written warning.

Trooper Stevens had Defendant Hernandez-Rodriguez sit on the front passenger seat of his patrol car and

Trooper Stevens sat in the driver's seat. The Trooper began to check Defendant Hernandez-Rodriguez's driver's license and registration on his computer and issued Defendant Hernandez-Rodriguez a written warning for his violation. The Trooper explained to Defendant Hernandez-Rodriguez that he was going to issue him a written warning, and the Trooper and Defendant Hernandez-Rodriguez engaged in casual conversation. Defendant Hernandez-Rodriguez said that he had not had any prior tickets but had been arrested for DWI. Defendant Hernandez-Rodriguez said that his license expires this year and he might move to Mexico when it expires. Defendant Hernandez-Rodriguez said that he works for a company driving big machines but had not worked in three weeks and was having trouble paying bills. The Trooper asked Defendant Hernandez-Rodriguez where he was coming from and Defendant Hernandez-Rodriguez said he had been to another company to look for a job. Trooper Stevens asked Defendant Hernandez-Rodriguez which company he had been to and where it was located but Defendant Hernandez-Rodriguez could not answer those questions. Instead, Defendant Hernandez-Rodriguez talked about needing another job because he was not working. The Trooper asked Defendant Hernandez-Rodriguez where he went to church, since the Trooper had seen a cross in Defendant Hernandez-Rodriguez's vehicle. Defendant Hernandez-Rodriguez stated his "boss man" says no drinking and no smoking but did not tell the Trooper if or where he went to church. Defendant Hernandez-Rodriguez stated he had the cross because "church is good."

The Trooper then showed Defendant Hernandez-Rodriguez a form printed in Spanish asked him "where are you coming from?" Defendant Hernandez-Rodriguez still could not provide a location where he went to look for a job, and this time said "I-85." Defendant Hernandez-Rodriguez stated he was now on the way home to High Point. The Trooper asked Defendant Hernandez-Rodriguez why he was on this road if he was coming from I-85 and traveling to High Point. Defendant Hernandez-Rodriguez could not answer that question. During his casual conversation with Defendant Hernandez-Rodriguez, Trooper Stevens noticed a high degree of nervousness. Defendant Hernandez-Rodriguez had labored breathing and his stomach was pounding in

and out. Defendant Hernandez-Rodriguez was also unable to explain where he had been to look for a job and why he was traveling an alternate route home from I-85.

At this point, Trooper Stevens had finished the DCI checks and the written warning. The Trooper gave Defendant Hernandez-Rodriguez all of his documents and explained the warning. This occurred at approximately nine minutes and five seconds into the stop. Defendant Hernandez-Rodriguez said he had everything and understood the warning. The Trooper asked Defendant Hernandez-Rodriguez if he could ask him a few questions at this point and Defendant Hernandez-Rodriguez said "yes[.]" The Trooper told Defendant Hernandez-Rodriguez he was suspicious of his recent activities and his nervousness as well. Defendant Hernandez-Rodriguez said he was nervous because of the time he was arrested for DWI. The Trooper asked Defendant Hernandez-Rodriguez if he had anything illegal in the vehicle and Defendant Hernandez-Rodriguez began to speak more Spanish than English.

Defendant Hernandez-Rodriguez's nervousness began to increase and he started to stutter while talking, avoided eye contact, leaned away from the Trooper, and Defendant Hernandez-Rodriguez's stomach pounded harder and faster. The Trooper asked Defendant Hernandez-Rodriguez if he had any weapons in the vehicle and Defendant Hernandez-Rodriguez said "no." The Trooper asked Defendant Hernandez-Rodriguez if he had any marijuana in the vehicle and Defendant Hernandez-Rodriguez said "no." Trooper Stevens asked Defendant Hernandez-Rodriguez if Defendant Hernandez-Rodriguez had any cocaine in the vehicle and Defendant Hernandez-Rodriguez blinked his eyes making the sound associated with the word no (un-un). The Trooper asked Defendant Hernandez-Rodriguez if Defendant Hernandez-Rodriguez had any money in the vehicle in excess of ten thousand dollars and Defendant Hernandez-Rodriguez gave a little laugh as he said "no." The Trooper asked Defendant Hernandez-Rodriguez if he could search the Defendant's vehicle and Defendant Hernandez-Rodriguez said "yes." Trooper Stevens asked Defendant Hernandez-Rodriguez to provide written consent in addition to verbal consent.

> Defendant Hernandez-Rodriguez said he did not want to
> sign the form, but "it's ok, you can check it out."

(Doc. 60 at 3-8.)

At that point, Trooper Stevens and a fellow highway patrolman, J.S. Wooten, who had arrived at the scene, searched Hernandez-Rodriguez's truck. During the search, Trooper Stevens identified the two black suitcases and discovered several packages wrapped in black tape which contained cocaine hydrochloride. (Id. at 9.)

The parties also stipulated that Trooper Stevens never threatened or intimidated Hernandez-Rodriguez during the course of the stop, that Hernandez-Rodriguez was not handcuffed until he was placed under arrest after the cocaine was discovered in the bed of his truck, and that Trooper Stevens was radar-certified and had worked for the highway patrol for seven-and-a-half years at the time of the stop.

## II. ANALYSIS

Hernandez-Rodriguez's original motion sought to suppress all evidence obtained as a result of the June 29, 2010 traffic stop. (Doc. 47 at 1.) During the hearing, however, his counsel conceded that, by virtue of Trooper Stevens's knowledge of the controlled cocaine delivery, there was probable cause to effect an arrest. Thus, Hernandez-Rodriguez limited his motion to seek suppression only of his statements to the trooper.

Hernandez-Rodriguez advances two principal arguments. First, he contends that Trooper Stevens's questions during the traffic stop violated his Fifth Amendment rights under Miranda v. Arizona, 384 U.S. 436 (1966), on the grounds that the stop was prearranged and he was not free to leave while seated in the front of the trooper's vehicle. Second, he contends that even if the initial stop was legal under Terry v. Ohio, 392 U.S. 1 (1968), it was unnecessarily prolonged -- after the return of his license and registration and issuance of the warning[1] -- by the trooper's subsequent questioning about criminal drug activity so as to render it a custodial situation.

The Government argues that the traffic stop was a permissible "wall stop" -- a legitimate law enforcement technique that permits officers to "wall"-off an arrest of a drug conspirator from information that would reveal that the drugs he had just received were from a controlled delivery in an ongoing investigation. The Government contends that Hernandez-Rodriguez was not in custody when he made the potentially incriminating statements and, thus, no Miranda warning was required.

---

[1] Hernandez-Rodriguez conceded at the hearing that the trooper's questions up to the issuance of the warning did not unlawfully delay the traffic violation purpose of the stop.

**A. Custodial Interrogation Argument**

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that an individual must be advised of his rights against self-incrimination before any statements "made during custodial interrogation could be admitted in evidence." <u>Dickerson v. United States</u>, 530 U.S. 428, 431-32 (2000). "Absent formal arrest, <u>Miranda</u> warnings only apply 'where there has been such a restriction on a person's freedom as to render him 'in custody.''" <u>United States v. Parker</u>, 262 F.3d 415, 419 (4th Cir. 2001) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam)). Courts adopt a two-part inquiry: whether an individual would reasonably believe he was not free to "terminate the interrogation and leave," <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995), and whether his freedom from action, when viewed in light of all the circumstances, "is curtailed to a 'degree associated with formal arrest,'" <u>United States v. Colonna</u>, 511 F.3d 431, 435 (4th Cir. 2007) (quoting <u>Parker</u>, 262 F.3d at 419). In other words, in deciding whether to exclude a suspect's statements made in the absence of a <u>Miranda</u> warning, a court must determine whether "a reasonable man in the suspect's position would have understood his situation" to be one of

custody.  Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  The
burden of establishing an encounter as custodial rests with a
defendant.  United States v. Davis, 792 F.2d 1299, 1309 (5th
Cir. 1986).

Hernandez-Rodriguez contends initially that a reasonable
person would have believed he was in custody during the stop,
based on the fact that Trooper Stevens had stopped his vehicle
using his lights and siren, directed him to exit his vehicle,
frisked him, and placed him in the front seat of the patrol
vehicle for the duration of the encounter.  In this setting, he
contends, he reasonably believed he was "not free to leave" and
a Miranda warning was required prior to any questioning about
drugs.  (Doc. 47 at 3.)

When police question a suspect outside of a police station
environment, however, "Miranda is *not* triggered simply because a
person detained by the police has reasonable cause to believe
that he is not free to leave."  United States v. Streifel, 781
F.2d 953, 961 (1st Cir. 1986); United States v. Leshuk, 65 F.3d
1105, 1109 (4th Cir. 1995) ("[T]he perception . . . that one is
not free to leave is insufficient to convert a Terry stop into
an arrest." (second alteration in original) (quoting United
States v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1987))).  The
"free to leave" standard, without more, determines whether an
individual is "seized" within the meaning of the Fourth

Amendment such that any evidence uncovered during a search conducted without a reasonable suspicion that criminal activity was afoot must be excluded. <u>United States v. Weaver</u>, 282 F.3d 302, 309 (4th Cir. 2002) ("[A] 'seizure' warranting protection of the Fourth Amendment occurs when . . . a reasonable person would not feel free to leave or otherwise terminate the encounter.").

The fact that a person has been seized within the meaning of the Fourth Amendment, therefore, does not necessarily mean that he is "in custody" within the meaning of the Fifth Amendment. <u>United States v. Collins</u>, 972 F.2d 1385, 1405 (5th Cir. 1992) ("[A]lthough a temporary Fourth Amendment seizure may have occurred . . ., a Fifth Amendment custodial situation did not."). Instead, the court must consider a "host of factors" in deciding whether the suspect's freedom of action has been curtailed to "a degree associated with formal arrest." <u>Streifel</u>, 781 F.2d at 961 (citation omitted). Those factors include the location of the questioning, the number of officers present, the degree of physical restraint exercised over the defendant, and the duration and character of the interrogation. <u>United States v. Teemer</u>, 394 F.3d 59, 66 (1st Cir. 2005).

Applying these factors in the context of a traffic stop, the Supreme Court in <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984), held that an individual subject to a routine traffic stop is not

entitled to <u>Miranda</u> warnings prior to police questioning. According to the Court, routine traffic stops are "presumptively temporary and brief," in contrast to station-house interrogations which can extend indefinitely. <u>Id.</u> at 437-38. In addition, the public nature of most traffic stops, coupled with the small number of police officers typically involved, indicate that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in <u>Miranda</u> itself." <u>Id.</u> at 438-39.

Here, Hernandez-Rodriguez's vehicle was stopped for a clear traffic violation, and there is no indication that the trooper's questions or the atmosphere of the encounter were coercive. <u>See</u> <u>Collins</u>, 972 F.2d at 1405; <u>cf.</u> <u>United States v. Jimenez</u>, 602 F.2d 139, 144 (7th Cir. 1979) ("The extent to which <u>Miranda</u> applies to street encounters or car stops depends on whether these encounters reflect the type of inherently coercive tactics that may often attend a station-house interrogation."). Hernandez-Rodriguez was hardly overwhelmed by a police presence, either; it appears that only Trooper Stevens was present during the questioning.[2]

_____

[2] The trooper's dash camera audio/videotape of Hernandez-Rodriguez's stop reveals the presence of a second officer after Trooper Stevens had completed his questioning and obtained Hernandez-Rodriguez's oral permission to search the truck.

In addition, the fact that Hernandez-Rodriguez was questioned in Trooper Stevens's vehicle does not render him "in custody" for Miranda purposes. United States v. Plumman, 409 F.3d 919, 925 (8th Cir. 2005) (concluding that a suspect was not entitled to a Miranda warning even though two FBI agents questioned him for over three hours in an unlocked Federal Bureau of Investigation car); United States v. Murray, 89 F.3d 459, 462 (7th Cir. 1996) (holding that the defendant was not "in custody" when questioned while seated in the back of police squad car); cf. Collins, 972 F.2d at 1405 (holding that a suspect was not in custody despite the fact that his vehicle was stopped and officers escorted him back to his office to execute a search warrant). Hernandez-Rodriguez was not handcuffed or placed in the back of a locked law enforcement vehicle, but was permitted to sit in the front seat with the trooper. See United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995) (noting that suspects questioned in a police squad car were not in custody where they were not handcuffed or otherwise restrained).

The length and character of the questioning in this case also lack the hallmarks of a "police-dominated atmosphere," see United States v. Jones, 818 F.2d 1119, 1125 (4th Cir. 1987), that would trigger Miranda's requirements. While each interrogation must be evaluated in the totality of its circumstances, courts have held that questioning of

approximately half-an-hour, see United States v. Kelly, 991 F.2d
1308, 1313 (7th Cir. 1993), during daylight hours along a
roadside, United States v. Ramirez, No. 07-30022, 2009 WL
790985, at *15 (C.D. Ill. Mar. 23, 2009), does not rise to the
level of a custodial interrogation, even where multiple officers
are present, Plumman, 409 F.3d at 925.

The encounter occurred at mid-day along a public road, and
questioning was conducted by a single officer.   The interview
was recorded on Trooper Stevens's audio/video dash camera, which
reveals    that   Hernandez-Rodriguez's    broken    English   made
communication more difficult as the trooper tried to understand
the  Spanish-laden  and  often  rambling  responses  that  naturally
extended  the  duration.    The  trooper  wrote  and  delivered  the
warning    (and    returned    the    license    and    registration)
approximately  eleven  minutes  into  the  stop  --  conduct  the
Defendant   does   not   challenge   as   unduly   prolonged.    The
discussion  thereafter  lasted  only  two  minutes  before  Hernandez-
Rodriguez gave verbal consent to search.   The recording reveals
that  the  questions  after  the  issuance  of  the  warning  were
conversational,  straightforward,  and  limited  in  number;  indeed,
the  questions  about  any  illegal  activity  occurred  within  an
approximately  30  second  discussion  just  before  Hernandez-
Rodriguez consented to the search of his vehicle.   Cf. Johnson,
64  F.3d  at  1126  (noting  that  no  Miranda  warning  was  required

where "[n]o strong arm tactics were employed, and the [officers'] questioning was straightforward"); Murray, 89 F.3d at 462 ("There is no evidence that the police officers engaged in conduct which might have overborne [the suspect's] will.").

While acknowledging Berkemer, Hernandez-Rodriguez argues that his traffic stop was anything but routine and is precisely the type of improper conduct the Court envisioned when it expressed confidence that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer, 468 U.S. at 440. Hernandez-Rodriguez contends that law enforcement officers knew that he had drugs in his car and, as a result, had no intention of allowing him to leave regardless of how he answered the questions about his possible involvement in drug activities. Thus, he contends, the DEA purposefully circumvented Berkemer and Miranda's requirements by having a highway patrolman question him before his arrest.

Even if officers had no intention of allowing Hernandez-Rodriguez to leave, however, the trooper's subjective intent is irrelevant to the objective inquiry. As the Supreme Court noted in Berkemer, a "policeman's unarticulated plan has no bearing on the question [of] whether a suspect was 'in custody' at a

particular time." 468 U.S. at 442; accord Murray, 89 F.3d at
462 (noting that "[a]ny subjective intent on the part of [an]
officer to arrest [a suspect] is irrelevant" so long as a
reasonable person in the suspect's position at the time of
questioning would not believe that he was in custody); Kelly,
991 F.2d at 1313 (noting that "in Berkemer, the Court rejected
the argument that an officer's unarticulated decision [to arrest
a suspect] could effect the determination whether a suspect was
in custody"). As in Berkemer, Hernandez-Rodriguez was never
told he would be taken into custody, and a reasonable person
stopped for a traffic violation in Hernandez-Rodriguez's
position would not have believed he was under arrest at the time
of the questioning.

Contrary to Hernandez-Rodriguez's claim, a non-custodial
situation is not converted into a custodial one because the
police question someone they suspect of having committed a
crime. Mathiason, 429 U.S. at 495. Law enforcement officials,
for example, may question an individual suspected of committing
a felony as long as the suspect is not in police custody. See
United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004)
(holding that an individual who was under surveillance for
suspected money laundering was not entitled to a Miranda warning
when questioned by officers while in the parking lot of his
apartment). Even where police have a sufficient basis to

conduct an arrest, officers may elect to question the suspect so long as he is not "in custody." United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990) (citing Berkemer, 468 U.S. at 442); see also United States v. Harris, 528 F.2d 914, 915 (4th Cir. 1975) (permitting the introduction into evidence of a suspect's responses to police questioning even where officers had a sufficient basis to conduct an arrest prior to the questioning).

Hernandez-Rodriguez also contends that long-standing precedent prohibits law-enforcement agents from outsourcing interrogations to other law-enforcement agents in an effort to circumvent the Constitution's protections, citing Anderson v. United States, 318 U.S. 350, 356 (1943) ("[T]he fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers."), and United States v. Abu Ali, 528 F.3d 210, 227 (4th Cir. 2008) ( "United States law enforcement officials may not intentionally evade the requirements of Miranda by purposefully delegating interrogation duties to foreign law enforcement officers and then having the fruits of the interrogation admitted at trial in the United States."), cert. denied, 555 U.S. 1170 (2009). These cases are inapposite here, however, because the North Carolina Highway Patrol is bound by

the U.S. Constitution, as is the Federal Government, and state law enforcement officials in this case never violated Miranda's requirements.

True, some circumstances may convert an otherwise permissible Terry stop into a custodial arrest. Cf. United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993) (finding that even though the traffic stop was within the bounds of Terry, its occurrence in an isolated area where the suspect and his pregnant fiancee were ordered to the ground at gunpoint and questioned as helicopters circled overhead was the kind of "highly intrusive, 'non-arrest' encounter[]" in which the Berkemer Court had indicated that Miranda warnings might be required). Such circumstances simply do not appear here.

**B.    Allegations that the Stop was Unduly Prolonged into a Custodial Situation**

Relying on United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011), and United States v. Peralez, 526 F.3d 1115 (8th Cir. 2008), Hernandez-Rodriguez argues that Trooper Stevens failed to diligently pursue the ostensible purpose of the stop and unnecessarily extended it with a "blended process" of investigating potential drug crimes. In so doing, Hernandez-Rodriguez argues, the trooper caused the nature and character of the traffic stop to rise to the level of being custodial. His argument is unpersuasive.

Both Digiovanni and Peralez involved traffic stops that were extended by officers attempting to investigate drug interdiction in the absence of any reasonable suspicion of criminal activity. In Digiovanni, the court found that the officer's reliance on the presence of hanging shirts in the rear passenger compartment, a clean rental car, a hygiene bag on the back seat, and a travel route from Florida, among other observations, bordered on the "absurd" and evidenced a post hoc rationalization for the stop. 650 F.3d at 512-13. In Peralez, the court concluded that an officer's persistent questions about drug activity were more than a "brief extension" of a traffic stop that had been based on a trailer having obscured the vehicle's license plate. 526 F.3d at 1121.

Neither case held that the extension of the traffic stops constituted a "custodial" interrogation that would implicate Miranda warnings under the Fifth Amendment. Rather, both cases involved motions to suppress evidence allegedly seized in violation of the Fourth Amendment. Moreover, Hernandez-Rodriguez's case differs from each case in important factual respects.

First, it is a fundamental aspect of Terry that "an officer may extend or expand the scope of a traffic stop beyond the original justification" when it is consensual. Peralez, 526 F.3d at 1120; Digiovanni, 650 F.3d at 513-14 (finding that the

district court's conclusion that consent was involuntary, because the officer falsely implied that the defendant was bound by his earlier consent, was not clearly erroneous).  Hernandez-Rodriguez contends that the traffic stop was extended only after Trooper Stevens had returned his license and registration and issued the warning.  At this point, of course, Hernandez-Rodriguez was no longer even seized for Fourth Amendment purposes and was free to leave.  See Ohio v. Robinette, 519 U.S. 33, 39-40 (1996) ("[I]t would be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."); United States v. Farrior, 535 F.3d 210, 219 (4th Cir. 2008) ("The fact that Officer Morris had returned Farrior's license and registration also strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment."); United States v. Lattimore, 87 F.3d 647, 649, 652-53 (4th Cir. 1996) (en banc) (finding encounter consensual because the trooper's issuance of the citation rendered the defendant free to leave, even though he was not so advised); cf. Johnson, 64 F.3d at 1126 (explaining that no Miranda warning was required where suspects responded to an officer's questions and "affirmatively agreed to enter the squad car and talk" with police).

Here, the facts lean heavily in favor of the Government, which would bear the burden of demonstrating that the encounter was consensual. This is true even though Trooper Stevens inquired of Hernandez-Rodriguez whether he "could ask him a few questions." Cf. Robinette, 519 U.S. at 35-36 (holding, in Fourth Amendment analysis, that consent was valid even though obtained after the officer asked after issuing warning and returning license: "One question before you get gone: [A]re you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" (alteration in original)).

Second, and dispositive of Hernandez-Rodriguez's argument, is the rule that an officer can expand a Terry stop for reasons completely unrelated to the purpose of the traffic violation where he has reasonable suspicion that criminal activity is afoot. Digiovanni, 640 F.3d at 507, 511; Peralez, 526 F.3d at 1120. Unlike Peralez and Digiovanni, here Hernandez-Rodriguez concedes that Trooper Stevens, by virtue of his knowledge of the controlled delivery of cocaine, had not only reasonable suspicion, but probable cause that criminal activity was ongoing.

## III. CONCLUSION

At the time of Trooper Stevens's questioning about which Hernandez-Rodriguez complains, the totality of the circumstances indicates that he was not in custody. Thus, no Miranda warnings

were required, and the motion to suppress must be denied. Therefore,

IT IS ORDERED that Defendant Hernandez-Rodriguez's motion to suppress (Doc. 47) is DENIED.

    /s/   Thomas D. Schroeder
United States District Judge

March 7, 2012